No. 25-7261

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

*v.*

JOSEPH BLANDON-SAAVEDRA,
*Defendant-Appellee.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 25-310-KK*

## GOVERNMENT'S OPENING BRIEF

TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division

RAJESH R. SRINIVASAN
Assistant United States Attorney
Criminal Appeals Section

1000 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-7416
Email: rajesh.srinivasan@usdoj.gov

Attorneys for Plaintiff-Appellant
UNITED STATES OF AMERICA

## TABLE OF CONTENTS

**DESCRIPTION**                                                            **PAGE**

I. INTRODUCTION ............................................................................... 1

II. ISSUE PRESENTED ...................................................................... 3

III. STATEMENT OF THE CASE ....................................................... 3

    A. Jurisdiction, Timeliness, and Bail Status .............................. 3

    B. Statement of Facts and Procedural History ......................... 3

        1. Defendant rams his car into federal agents' vehicles while being apprehended in an immigration operation ..................................................... 3

        2. Defendant is arrested and charged, and HSI follows its policy for repairing damaged vehicles .......... 5

        3. Defendant files a motion to dismiss based on the repair of the HSI vehicle ................................................. 8

        4. The district court grants dismissal of the count involving the HSI vehicle .............................................. 9

IV. SUMMARY OF ARGUMENT ........................................................ 12

V. ARGUMENT ................................................................................. 13

    A. Standard of Review ................................................................. 13

    B. Destruction of Potentially Useful Evidence Violates Due Process Only If It Is Done in Bad Faith ....................... 14

    C. Ninth Circuit Precedent Defines the Standard for Assessing Bad Faith Under *Youngblood* .............................. 16

        1. Compliance with agency policy indicates good faith ..................................................................... 16

**TABLE OF CONTENTS (continued)**

**DESCRIPTION**                                               **PAGE**

      2.     Bad faith requires knowledge of apparent exculpatory value ........................................................18

      3.     Negligence or recklessness does not constitute bad faith ...................................................................19

  D.     The District Court Committed Legal Error by Disregarding this Court's Standard for Bad Faith..............21

      1.     The district court ignored the significance of HSI's compliance with its policy on repairs.................22

      2.     The district court applied the incorrect standard to assess whether agents knew of the HSI vehicle's exculpatory value ...........................................24

      3.     The district court did not consider whether HSI was merely negligent in repairing its vehicle .............28

  E.     Under the Correct Framework, Agents Did Not Act in Bad Faith by Repairing the HSI Vehicle ..............................29

  F.     The Record Does Not Support a Finding of Bad Faith on the Prosecutor's Part........................................34

VI.   CONCLUSION ........................................................................35

## TABLE OF AUTHORITIES

**DESCRIPTION**                                               **PAGE(S)**

**Cases**

*Arizona v. Youngblood,*
488 U.S. 51 (1988) .................................................................... passim

*California v. Trombetta,*
467 U.S. 479 (1984) ............................................................. 14, 16, 17

*Cunningham v. City of Wenatchee,*
345 F.3d 802 (9th Cir. 2003) ............................................ 19, 21, 25, 31

*Downs v. Hoyt,*
232 F.3d 1031 (9th Cir. 2000) .................................................. 31, 32

*Mitchell v. Goldsmith,*
878 F.2d 319 (9th Cir. 1989) ........................................... 17, 18, 21, 22

*Phillips v. Woodford,*
267 F.3d 966 (9th Cir. 2001) ..................................................... 19, 21

*United States v. Barton,*
995 F.2d 931 (9th Cir. 1993) ....................................... 16, 17, 21, 22, 30

*United States v. Bingham,*
653 F.3d 983 (9th Cir. 2011) ............................................................ 21

*United States v. Collins,*
551 F.3d 914 (9th Cir. 2009) ..................................................... 13, 28

*United States v. Cooper,*
983 F.2d 928 (9th Cir. 1993) .................................................... passim

*United States v. Del Toro-Barboza,*
673 F.3d 1136 (9th Cir. 2012) ................................................... passim

*United States v. Dring,*
930 F.2d 687 (9th Cir. 1991) ....................................... 17, 20, 21, 22, 30

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                    **PAGE(S)**

*United States v. Flyer,*
    633 F.3d 911 (9th Cir. 2011) .................................................... 19, 20, 21

*United States v. Heffington,*
    952 F.2d 275 (9th Cir. 1991) ................................................... 17, 21, 22

*United States v. Hernandez,*
    109 F.3d 1450 (9th Cir. 1997) ................................................. 17, 21, 22

*United States v. Hinkson,*
    585 F.3d 1247 (9th Cir. 2009) ......................................................... 29

*United States v. Rambo,*
    74 F.3d 948 (9th Cir. 1996) ........................................................ 20, 29

*United States v. Robertson,*
    895 F.3d 1206 (9th Cir. 2018) ................................................. 13, 26, 27

*United States v. Sivilla,*
    714 F.3d 1168 (9th Cir. 2013) ........................................... 19, 21, 25, 28

*United States v. Zaragoza-Moreira,*
    780 F.3d 971 (9th Cir. 2015) ..................................................... passim

**Statutes**

18 U.S.C. § 111 ............................................................................... 6, 7

18 U.S.C. § 3142 ........................................................................... 3, 6, 9

18 U.S.C. § 3231 ................................................................................. 3

18 U.S.C. § 3731 ................................................................................. 3

28 U.S.C. § 1291 ................................................................................. 3

**Rules**

Fed. R. App. P. 4(b)(1)(B)(i) ................................................................ 3

iv

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**          **PAGE(S)**

Fed. R. Crim. P. 3 ................................................................................33

Fed. R. Crim. P. 16 ..........................................................................9, 13

No. 25-7261

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

*v.*

JOSEPH BLANDON-SAAVEDRA,
*Defendant-Appellee.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE CENTRAL DISTRICT OF CALIFORNIA*
*DISTRICT COURT NO. CR 25-310-KK*

**GOVERNMENT'S OPENING BRIEF**

**I**

**INTRODUCTION**

After a local sheriff's department disregarded an immigration detainer placed on defendant Joseph Blandon-Saavedra, agents from Immigration and Customs Enforcement ("ICE") and Homeland Security Investigations ("HSI") had to launch an operation to apprehend him. But defendant did not allow agents to do so peacefully. Instead, he rammed his car into ICE and HSI vehicles, and a damaged HSI vehicle

had to be towed. For these acts, defendant was charged with two counts of assaulting a federal officer.

In the meantime, in accordance with agency policy and mindful of an impending funding shutoff, HSI repaired its vehicle so that it could return to service. Defendant then filed a motion to dismiss the indictment based on that repair, arguing that it constituted spoliation of evidence in violation of due process. The district court subsequently dismissed one count after finding that the repair was done in bad faith.

In doing so, the district court got the law wrong. It disregarded the Ninth Circuit's legal framework for assessing bad faith in spoliation cases, and as a result, it improperly discounted HSI's compliance with its policies, its lack of knowledge that the HSI vehicle had any exculpatory value, and its mere negligence in repairing the vehicle. Even if the district court had applied the correct legal standard, its bad-faith finding would be clearly erroneous. Nothing in the record shows that agents were trying to gain an advantage over defendant at trial by repairing the car, and it would be illogical to punish agencies for fixing service vehicles damaged by defendants during law enforcement operations. This Court should reverse.

2

# II

# ISSUE PRESENTED

Did the district court commit legal error or, alternatively, clearly err in finding that government agents acted in bad faith by repairing a service vehicle damaged by defendant?

# III

# STATEMENT OF THE CASE

## A. Jurisdiction, Timeliness, and Bail Status

The district court's jurisdiction rested on 18 U.S.C. § 3231. This Court's jurisdiction rests on 18 U.S.C. § 3731 and 28 U.S.C. § 1291. The district court dismissed the count at issue on November 14, 2025. (ER-4-14.) The government filed a timely notice of appeal three days later. (ER-234.) *See* Fed. R. App. P. 4(b)(1)(B)(i). Defendant was not detained under 18 U.S.C. § 3142 pending trial on his charges, but he has been detained by ICE based on his immigration status.

## B. Statement of Facts and Procedural History

### 1. *Defendant rams his car into federal agents' vehicles while being apprehended in an immigration operation*

The story of this case began with defendant's arrest for second-degree burglary. (ER-148.) Upon his arrest, ICE lodged an

3

immigration detainer because defendant is an illegal alien. (ER-148.) But the San Bernadino County Sheriff's Department refused to honor the detainer. (ER-148.) Instead, it released defendant. (ER-148.)

That release necessitated the immigration operation that led to the charges in this case. On the morning of September 4, 2025, ICE Enforcement and Removal Operations ("ERO") and HSI agents began surveilling defendant's home. (ER-4.) After seeing defendant leave his home and drive away in a black Toyota Corolla, three agents tried to apprehend him by boxing him in with their cars. (ER-4-5, 162-63.) Flashing his car's interior emergency lights, HSI Agent Elijah Mejia drove in front of defendant. (ER-148, 162.) Defendant initially stopped. (ER-162.) Next, ICE ERO Officer Marco Perera pulled up behind defendant. (ER-162.) Defendant reversed and rammed into Officer Perera's car ("the ERO vehicle"). (ER-162.) HSI Agent Bradley Tomaselli then pulled up on the driver's side of defendant's car. (ER-163, 223.) Defendant drove straight into Agent Tomaselli's car ("the HSI vehicle"):

4

  

(ER-163.) The agents then arrested defendant and transported him and the damaged cars back to the ERO field office. (ER-5, 43.) The ERO vehicle was driven there, but the HSI vehicle had to be towed. (ER-34, 43.) Agents took photographs of the damaged cars. (ER-43, 88-100.)

### 2. *Defendant is arrested and charged, and HSI follows its policy for repairing damaged vehicles*

At the field office, agents who were not involved in defendant's arrest interviewed him. (ER-5.) According to an agent report of the interview, an agent "informed [defendant] that the agents were there to discuss the incident that occurred earlier that day, to which [defendant] stated they hit me." (ER-5.)

Meanwhile, Agent Tomaselli immediately reported the damage to his HSI vehicle to his supervisor. (ER-5, 34, 45.) The report was done in accordance with local HSI policy:

> By local policy, if a GOV [government-owned vehicle] is involved in an accident or collision, the HSI law enforcement officer must immediately, among other things, notify his or her supervisor and report the accident or collision to the local Police Department, Sheriff's Department, or Highway Patrol. Generally, the HSI law enforcement officer and his or her supervisor will obtain estimates for repair. A Mission Support Specialist may then assist with taking the vehicle to the shop for repair, monitoring the status of the repair, and obtaining a loaner GOV, if one is available.

(ER-45-46.) This policy helps preserve the HSI office's limited resources. "HSI Los Angeles has a limited inventory of GOVs, and as such, HSI has been repairing damaged GOVs as soon as possible for HSI law enforcement officers to utilize in the course of their law enforcement duties." (ER-45.) In fact, "HSI Los Angeles currently has 11 loaner GOVs for approximately 450 law enforcement officers across the area of responsibility." (ER-45.)

The day after defendant's arrest, the government filed a complaint charging him with assaulting, resisting, or impeding a federal officer using a dangerous or deadly weapon in violation of 18 U.S.C. § 111 (a)(1), (b). (ER-159-64.) Although defendant was ultimately not detained under 18 U.S.C. § 3142 pending trial, he was taken into custody by ICE on an immigration detainer. (ER-5-6, 152.)

6

Prior to indictment, defendant's counsel sent the assigned prosecutor a general discovery letter on September 8, 2025, requesting "an opportunity to inspect, copy, and/or test all tangible objects and buildings or places which the government intends to use in its case-in-chief at trial and/or which are material to preparation of Mr. Blandon-Saavedra's defense," as well as "preservation of . . . physical evidence that may be destroyed, lost, or otherwise put out of possession, custody, or care of the government." (ER-6, 130-32.) Defense counsel did not list specific items of evidence that it expected the government to preserve or turn over, and it did not mention either the HSI or ERO vehicle.

A grand jury subsequently indicted defendant on two counts of violating 18 U.S.C. § 111 (a)(1), (b). (ER-157-58.) Count one concerned defendant's ramming Officer Perera's ERO vehicle; count two concerned defendant's ramming Agent Tomaselli's HSI vehicle. (ER-157-58.)

In the meantime, HSI continued the process of repairing the HSI vehicle. Between September 4 and September 15, agents sent emails discussing the repair process and costs. (ER-56-60.) On September 16, the repairs were approved and paid for. (ER-7, 83.) Nowhere in the email chain did agents suggest that the HSI vehicle had any

exculpatory value for defendant or discuss trial strategy; the conversation focused on getting the vehicle repaired as soon as possible before an impending funding cutoff for HSI. (*E.g.*, ER-55 ("To give ourselves the best shot at getting his needed repairs over the hurdle before the money shuts off tomorrow are there any additional items still missing; additional estimates, etc?").)

It was only on October 27 that defendant's counsel emailed the government requesting an "inspection of all vehicles present at the scene." (ER-7, 144.) The prosecutor assigned to the case responded within 10 minutes and said she had reached out to the agent to locate the vehicles. (ER-142-44.) The next day, the prosecutor told defense counsel that they could inspect the vehicles that week but that "one of the vehicles ha[d] been repaired." (ER-7, 141.)

The repaired HSI vehicle was picked up on October 29. (ER-7, 34.) The ERO vehicle was not repaired and continues to be available for inspection. (ER-7.)

### 3.   *Defendant files a motion to dismiss based on the repair of the HSI vehicle*

Defendant initially moved to dismiss his indictment on the ground that ICE had detained him after the district court released him pending

8

trial on his criminal charges under 18 U.S.C. § 3142.  (ER-148-49.)  He then separately moved to dismiss the indictment based on spoliation of evidence.  (ER-101-25.)  He argued that the repair of the HSI vehicle violated his due-process rights under *Arizona v. Youngblood*, 488 U.S. 51 (1988), and Federal Rule of Criminal Procedure 16.  (ER-113-25.)  These violations, he contended, warranted dismissal.  (ER-125.)  The government opposed, arguing that the car did not have apparent exculpatory value, comparable evidence remained available, the car was not repaired in bad faith, and Rule 16 was not violated.  (ER-31-42.)

### 4. *The district court grants dismissal of the count involving the HSI vehicle*

After a hearing, the district court granted the motion to dismiss the count involving the HSI vehicle based on spoliation.  (ER-4-14, 165-233.)  The district court summarized the *Youngblood* test as requiring proof that (1) the evidence at issue had exculpatory value that was apparent before it was destroyed, (2) the government acted in bad faith, and (3) comparable evidence could not be obtained by reasonably available means.  (ER-9.)  The court found each requirement met.  (ER-9-13.)

The court noted that the first requirement is met whenever the material is either materially exculpatory or potentially useful, meaning that the evidence may have exonerated a defendant had it been subjected to further testing. (ER-9-10.) The court noted that while it could not "conclude [the] HSI vehicle was material exculpatory evidence," it was "conceded by the Government at the hearing" that the HSI vehicle had potential usefulness, and "[f]urther examination and inspection of the HSI Vehicle could have demonstrated Agent Tomaselli, in fact, hit [defendant's] car first." (ER-10.)

As to the second requirement, the court concluded that the government had acted in bad faith because defendant told agents in his post-arrest interview that "they hit me." (ER-10-11.) Because an agent had included this statement in his report of the interview, the court made an inferential leap that the agent "understood the significance of this statement" and thus knew about the "exculpatory value of the HSI Vehicle from the outset, well before HSI commenced and completed the repairs." (ER-11.) The court also relied on the fact that the report was approved by another agent who had direct knowledge of the repairs. (ER-12.) And it faulted an agent for not including defendant's assertion

10

that "they hit me" in the agent's affidavit supporting the complaint against defendant. (ER-11.)

The court found it irrelevant that HSI was following its internal policies: "Adherence to standard policies and procedures does not disprove bad faith, and an agency's internal protocols do not justify the bad faith destruction of evidence." (ER-12.) The court noted that while "[a]t worst, the Government intentionally expedited repairs to deny [defendant] his right to inspect and investigate potentially useful evidence," it acknowledged that the record "at best" reflected that HSI had "prioritized administrative expedience and the apparent need to avoid an impending funding cutoff over its constitutional duty to preserve exculpatory evidence." (ER-12.) Accordingly, the court concluded that agents had engaged in a "conscious effort to suppress exculpatory evidence." (ER-12 (citation modified).)

Finally, the court found that no comparable evidence existed, even though HSI had taken photos of the vehicle before it was repaired and neither the ERO car nor defendant's car had seemingly been repaired. (ER-12-13, 197.) The court credited a defense expert's assertion that a physical inspection of the cars was necessary because "photographs

11

cannot capture three-dimensional deformation, crush depth, transfer marks, or other impact-related characteristics, nor can they provide the precise measurements required for a complete and accurate reconstruction." (ER-12-13, 30.)

The district court also found that the assigned prosecutor had violated Rule 16. (ER-13-14.) It declined, however, to decide whether the prosecutor's actions were a separate due-process violation that justified dismissal of the count. (ER-14.)

## IV

## SUMMARY OF ARGUMENT

This appeal is about legal error. Specifically, in assessing bad faith, the district court applied an incorrect framework under Ninth Circuit precedent. Its error was threefold. First, the district court incorrectly disregarded the agents' compliance with department policy in repairing the vehicle, in contravention of Ninth Circuit precedent requiring courts to consider such compliance as evidence of good faith. Second, the district court conflated agents' hearing defendant's assertion that "they hit me" with knowing about the apparent exculpatory value of the HSI vehicle, even though there was nothing

12

obviously or likely exculpatory about the vehicle. Third, the district court found bad faith despite acknowledging that HSI's actions could be viewed as mere negligence rather than an effort to gain an advantage over defendant at trial. Application of the correct legal standard to this record cannot yield a bad-faith finding, whether under a de novo standard of review or clear error. Finally, the record does not support affirmance based on Federal Rule of Criminal Procedure 16.

## V

## ARGUMENT

### A.    Standard of Review

The Court "review[s] de novo a due process claim involving the government's failure to preserve potentially exculpatory evidence" and "review[s] factual findings, such as the absence of bad faith, for clear error." *United States v. Robertson*, 895 F.3d 1206, 1211 (9th Cir. 2018) (citation modified). But "where the district court applies the wrong legal standard" to a claim, this Court "review[s] the claim de novo." *United States v. Collins*, 551 F.3d 914, 919 (9th Cir. 2009).

13

**B. Destruction of Potentially Useful Evidence Violates Due Process Only If It Is Done in Bad Faith**

In *California v. Trombetta*, the Supreme Court held that the destruction of evidence violates due process when the evidence "both possess[es] an exculpatory value that was apparent before the evidence was destroyed" and "the defendant would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. 479, 489 (1984). Accordingly, the Court held that California's policy of not preserving breathalyzer samples comported with due process because "chances [were] extremely low that preserved samples would have been exculpatory" and defendants had "alternative means of demonstrating their innocence" through inspection of the breathalyzer machine used to take their sample, cross examination of the officer who took the sample to prove "operator error," and evidence of environmental factors that may have affected the test. *Id.* at 489-90.

The Supreme Court further clarified this test in *Arizona v. Youngblood*, 488 U.S. 51 (1988). There, a defendant was prosecuted for sexual assault, and police failed to properly preserve semen samples and the victim's clothing for testing. *Id.* at 58. That evidence was not clearly exculpatory; "no more can be said than that it could have been

14

subjected to tests, the results of which might have exonerated the defendant." *Id.* at 57. The Supreme Court held that when police fail to preserve this kind of "potentially useful evidence," a defendant must "show bad faith on the part of the police" to establish a due-process violation. *Id.* at 58. That requirement "limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police *themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.*" *Id.* (emphasis added). "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.*

Applying this requirement, the Supreme Court found no bad faith because "the failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent," and no information about this failure was concealed from defendant. *Id.* The Supreme Court also rejected the notion that "the Due Process Clause is violated when the police fail to use a particular investigatory tool." *Id.* at 59. That situation "is no different than a

15

prosecution for drunken driving that rests on police observation alone; the defendant is free to argue to the finder of fact that a breathalyzer test might have been exculpatory, but the police do not have a constitutional duty to perform any particular tests." *Id.*

## C. Ninth Circuit Precedent Defines the Standard for Assessing Bad Faith Under *Youngblood*

Since *Youngblood*, the Ninth Circuit has elucidated the definition of bad faith in this context. In particular, this Court requires assessment of whether agents complied with departmental policy, whether the government lacked knowledge of the evidence's apparent exculpatory value, and whether the government acted merely negligently or recklessly as opposed to with the goal of gaining a tactical advantage over the defendant.

### 1. *Compliance with agency policy indicates good faith*

To begin with, this Court has noted that "a police department's compliance with departmental procedure should be regarded as an indication that the disposal of evidence was not performed in bad faith." *United States v. Barton*, 995 F.2d 931, 935 (9th Cir. 1993) (citation modified). That observation finds support in *Trombetta* and *Youngblood*, both of which discuss compliance with procedure in finding

16

good faith. *See Trombetta*, 467 U.S. at 488 (finding that officers' failure to "preserve breath samples" for DUI defendants was done "in good faith and in accord with their normal practice" and holding that this policy was "without constitutional defect"); *Youngblood*, 488 U.S. at 53 (citing testimony that criminologist followed "standard department procedure" in examining sexual-assault evidence). Compliance with department procedure shows that police are not trying to gain "an unfair tactical advantage . . . at trial" over a particular defendant by destroying evidence. *United States v. Dring*, 930 F.2d 687, 695 (9th Cir. 1991); *see United States v. Heffington*, 952 F.2d 275, 281 (9th Cir. 1991) ("The trial court specifically found that the evidence was disposed of in compliance with 'departmental procedures.' This routine disposal of the evidence was apparently not the product of any realization that the evidence could form a basis for exonerating the defendant.").

Accordingly, this Court has repeatedly rejected arguments that bad faith was present where police were merely following departmental policy in not preserving evidence. *E.g. Barton*, 995 F.2d at 935; *Heffington*, 952 F.2d at 281; *Dring*, 930 F.2d at 695; *United States v. Hernandez*, 109 F.3d 1450, 1455 (9th Cir. 1997); *Mitchell v. Goldsmith*,

17

878 F.2d 319, 322 (9th Cir. 1989).  In contrast, the Court has found bad faith where evidence was "destroyed" outside of "the normal course of the government's usual procedures."  *United States v. Zaragoza-Moreira*, 780 F.3d 971, 980 (9th Cir. 2015).

### 2. *Bad faith requires knowledge of apparent exculpatory value*

Second, this Court has said that "the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed" is a condition necessary to a bad-faith finding "because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith."  *Zaragoza-Moreira*, 780 F.3d at 977.  This too finds support in *Youngblood*, which limits bad faith to situations where "police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant."  488 U.S. at 58.

This Court has frequently found a lack of bad faith on this basis.  In *United States v. Del Toro-Barboza*, this Court held that defendants who were charged with cash smuggling were not deprived of due process when police failed to preserve either the cash or the box containing the cash for fingerprint testing.  673 F.3d 1136, 1149-50 (9th

18

Cir. 2012). Because the government had "no knowledge that the evidence [was] likely exculpatory . . . the destruction or loss of such evidence [was] not fundamentally unfair" and did "not offend traditional notions of due process." *Id.* at 1150. Similarly, in *United States v. Sivilla*, this Court found that agents did not act in bad faith by forfeiting a Jeep in which they found drugs during a border crossing because "[t]he exculpatory value of the Jeep was not obvious." 714 F.3d 1168, 1170-72 (9th Cir. 2013). And in *Cunningham v. City of Wenatchee*, the Court noted that evidence cannot have been destroyed in bad faith when it could have either "exonerated" the defendant or "incriminated him." 345 F.3d 802, 812 (9th Cir. 2003); *see also Phillips v. Woodford*, 267 F.3d 966, 987 (9th Cir. 2001) (finding no bad faith where there was no "reason to believe that the exculpatory value" of truck in which victims were shot "was apparent prior to its destruction").

### 3. *Negligence or recklessness does not constitute bad faith*

Third, this Court has emphasized *Youngblood*'s observation that "[b]ad faith requires more than mere negligence or recklessness." *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011). This

requirement differentiates situations in which the government "purposefully destroy[s] the evidence to gain an unfair advantage at trial" from ones in which the government commits a "mere oversight" in failing to preserve evidence. *Zaragoza-Moreira*, 780 F.3d at 980.

Again, *Del Toro-Barboza* is illustrative. The Court noted that it would have been "a better practice for the government to have retained both the box and the money for Defendants to test," but their failure to do so amounted to "mere negligence or recklessness," not bad faith. 673 F.3d at 1150 (quoting *Flyer*, 633 F.3d at 916). The Court contrasted that scenario with one in which "the government has intentionally destroyed evidence *knowing it is of value* for the defense against criminal charges." *Id.* (emphasis added). Similarly, in *United States v. Rambo*, this Court found that police did not destroy "potentially exculpatory evidence in bad faith when they fired multiple rounds using [the defendant's] firearm and silencer while conducting test firing." 74 F.3d 948, 954 (9th Cir. 1996). "Although the deputies fired more rounds than were necessary, that indicates only poor judgment, not bad faith." *Id.*

\* \* \*

20

"[I]t is the criminal defendant who bears the burden of proving that the Government acted in bad faith" under these legal principles. *Dring*, 930 F.2d at 694. Rarely has this Court found the burden met. *Compare, e.g.*, *Zaragoza-Moreira*, 780 F.3d at 977 (9th Cir. 2015) (reversing district court finding of good faith), and *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993) (affirming finding of bad faith), *with Del Toro-Barboza*, 673 F.3d at 1150; *Flyer*, 633 F.3d at 916; *Barton*, 995 F.2d at 935; *Heffington*, 952 F.2d at 281; *Dring*, 930 F.2d at 695; *Cunningham*, 345 F.3d at 812; *Sivilla*, 714 F.3d at 1172; *Woodford*, 267 F.3d at 987; *Hernandez*, 109 F.3d at 1455; *Goldsmith*, 878 F.2d at 322; *United States v. Bingham*, 653 F.3d 983, 994 (9th Cir. 2011).

## D. The District Court Committed Legal Error by Disregarding this Court's Standard for Bad Faith

This is not the exceptional case in which agents acted in bad faith. In finding otherwise, the district court erred by disregarding the legal principles set forth above.

21

### 1. *The district court ignored the significance of HSI's compliance with its policy on repairs*

First, the district court failed to credit the fact that HSI "'followed its own policies' in repairing the HSI Vehicle" as a factor showing good faith. (ER-12.) The district court dismissed this argument summarily, saying only that "[a]dherence to standard policies and procedures does not disprove bad faith, and an agency's internal protocols do not justify the bad faith destruction of evidence." (ER-12.) That statement of law contradicts the guidance offered in cases extending across three decades, including *Barton*, *Heffington*, *Dring*, *Hernandez*, and *Goldsmith*, all of which found that compliance with agency policy evidenced a lack of bad faith. *See supra* Section V.C.1.

In misstating the law, the court relied on two cases: *Zaragoza-Moreira* and *Cooper*. (ER-12.) Neither supports the district court's rule. While *Zaragoza-Moreira* involved surveillance that was automatically erased after 30 to 45 days, 780 F.3d at 977, the opinion does not discuss any policy or procedure that would have prevented its retention. To the contrary, the Court found that the video was *not* "destroyed in the normal course of the government's usual procedures." *Id.* at 980. Here, in contrast, the HSI agent was required to follow the vehicle-repair

22

policy to ensure that HSI did not indefinitely lose its service vehicle given an impending funding cutoff. And in *Cooper*, the court did "not address whether [the agent] followed the [agency] policy or whether it was a bad faith policy" because the government did "not challenge the bad faith determination." 983 F.2d at 930. Thus, neither case permitted the district court to disregard HSI's compliance with policy.

Defendant did not suggest, and the district court did not hold, that a policy requiring the repair of damaged government vehicles is a bad-faith policy, and there was no dispute that HSI followed that policy. (*See, e.g.*, ER-195 (government argument that "HSI has a policy [under] which they repair vehicles, and it would have been incumbent upon [defendant] to submit a very specific request asking that [the government] preserve the vehicle"); ER-186 (defense argument that "HSI's internal policy regarding cars or auto repairs, it's certainly not controlling").) The district court should have weighed policy compliance as a factor favoring good faith, and it legally erred by not doing so.

23

### 2. *The district court applied the incorrect standard to assess whether agents knew of the HSI vehicle's exculpatory value*

Second, the district court applied the improper framework for assessing whether agents knew of the apparent exculpatory value of the HSI vehicle. The court improperly conflated hearing "[defendant's] defense claim" with knowing about the apparent "exculpatory value of the HSI Vehicle from the outset." (ER-11.)

But nothing about defendant's three-word claim—"they hit me" (ER-11)—indicated that there was something exculpatory about the HSI vehicle. For one thing, those words do not necessarily mean that the agents hit him *first*, as the district court interpreted them to mean. Nor did defendant assert to agents that "the vehicle's crush profiles, paint transfer, deformation patterns, and mechanical damage angles" would prove that agents hit him first. (ER-12.) In fact, both defense counsel and the district court needed to rely on an expert opinion to reach that conclusion. (ER-12-13, 30.) If expert opinion was required to explain the significance of the unrepaired vehicle, then defendant's statement necessarily could not have indicated to agents that the HSI

24

vehicle was "likely exculpatory" or had "obvious" exculpatory value. *Del Toro-Barboza*, 673 F.3d at 1150; *Sivilla*, 714 F.3d at 1172.

At most, the car could have been either exculpatory (by being consistent with agents' hitting defendant first) or inculpatory (by showing that, consistent with the observations of the agents, that defendant hit them first). That kind of evidence does not have apparent exculpatory value. *See Cunningham*, 345 F.3d at 812. By equating a vague statement about a possible defense theory with knowledge about the exculpatory value of a piece of evidence, the district court ignored this Court's legal standards for making this determination.

Again, neither *Cooper* nor *Zaragoza-Moreira* is to the contrary. (ER-11.) In *Cooper*, the government conceded bad faith, and the facts there supported that concession. 983 F.2d at 931. The agents in *Cooper* were repeatedly told that the defendants' machines were configured to produce *legal* drugs, rather than the illegal methamphetamine that they were charged with making. *Id.* Yet agents failed to preserve those machines despite assuring the defense that they would. *Id.* In contrast, defendant here did not tell agents that the car would show that agents hit him first or ask agents to preserve the vehicles. It was

only in October after the repairs had started that defense counsel asked to inspect them.

*Zaragoza-Moreira* likewise presents a stronger case of bad faith. There, a drug defendant told an agent specifically what actions she took in a border-crossing line to make herself "obvious" and show that she was acting under duress, including "making a lot of noises," making "motions . . . to indicate to border agents that 'there was something wrong with me,'" "wiggl[ing] around," "patt[ing] her stomach," and "throw[ing] her passport on the ground to draw attention to herself." 780 F.3d at 979 (citation modified). Thus, a video depicting those actions had obvious exculpatory value without sophisticated analysis. The agent would have merely needed to view the video, which she knew existed, to verify the defendant's story. *Id.* at 980. Contrast that obviously valuable evidence to the evidence here. Defendant gave no detail that would have suggested to agents that the vehicle had exculpatory value, and expert analysis would have been necessary to determine whether the evidence was in fact exculpatory.

This case is instead closer to *Robertson*, in which this Court distinguished *Zaragoza-Moreira*. *Robertson* also involved the loss of

26

video surveillance, but the Court observed that the defendant never asked "the government to preserve the video," nor "explain[ed] how or why the parking lot [surveillance] video" at issue in the case "might contain exculpatory evidence." 895 F.3d at 1212. "At most," the Court found, "[the agent] was slow to obtain evidence of speculative value of which he had been *indirectly* put on notice." *Id.* (emphasis added). Based on those facts, the defendant in *Robertson* was "unlike the defendant in *Zaragoza-Moreira*" because he had not "made any affirmative assertion that would have put [the agent] on notice of the relevance of the video to" the defense's theory. *Id.* at 1212-13.

So too here. In his initial interview, defendant never asked agents to preserve the HSI vehicle nor explained to agents how the HSI vehicle might contain exculpatory evidence. At best, agents were put indirectly on notice of the vehicle's "speculative value," but under *Robertson*, that is not enough to establish bad faith. *Id.* at 1212. The district court should have reached that conclusion by applying the correct framework for assessing this factor.

27

### 3. The district court did not consider whether HSI was merely negligent in repairing its vehicle

Finally, the district court improperly collapsed two different factors into one: whether the government lacks knowledge of apparent exculpatory value and whether the government was negligent in failing to preserve the evidence. The district court read *Sivilla* to hold that "if the government lacks knowledge of the exculpatory value of the evidence, the government is merely 'negligent in not preserving the evidence.'" (ER-12 (quoting *Sivilla*, 714 F.3d at 1172).) But like other Ninth Circuit and Supreme Court precedent, *Sivilla* treats the government's negligence as a separate factor that shows the government acted in good faith and was not trying to gain a tactical advantage over a defendant.

*Zaragoza-Moreira*, the district court's primary authority, applies this same legal principle. There, the Court rejected the argument that the government "did not purposefully destroy the evidence to gain an unfair advantage at trial" and acted with mere negligence. 780 F.3d at 980 (citation modified). Instead, it found that the agents' actions amounted to "a conscious effort to suppress exculpatory evidence." *Id.* (citation modified).

28

Here, in contrast, the district court acknowledged that the evidence *could* support a finding of mere negligence, noting that the government "at best prioritized administrative expedience and the apparent need to avoid an impending funding cutoff over its constitutional duty to preserve exculpatory evidence." (ER-12.) But the prioritization of law enforcement resources is not a "conscious effort to suppress exculpatory evidence" (ER-12 (citation modified); it is at most "poor judgment" or a deviation from best practices. *Rambo*, 74 F.3d at 954; *Del Toro-Barboza*, 673 F.3d at 1150. Actions of that sort do not constitute bad faith under Ninth Circuit precedent.

## E. Under the Correct Framework, Agents Did Not Act in Bad Faith by Repairing the HSI Vehicle

Given these legal errors, the Court reviews the bad-faith finding de novo under the correct legal framework. *Collins*, 551 F.3d at 919. Regardless, even under clear-error review, the district court's decision should be reversed because it is illogical, implausible, and bereft of support in the record. *United States v. Hinkson*, 585 F.3d 1247, 1262-63 (9th Cir. 2009) (en banc). The facts cannot support a bad-faith finding

First, HSI agents followed policy in repairing the vehicle, which is "an indication that the disposal of evidence was not performed in bad

faith." *Barton*, 995 F.2d at 935 (citation modified). Nothing in the record suggests that agents were attempting to gain "an unfair tactical advantage . . . at trial." *Dring*, 930 F.2d at 695. To the contrary, the unchallenged affidavit of an HSI agent makes clear that HSI has limited loaner vehicles for its hundreds of local agents, and following HSI's policy ensures that a damaged vehicle can be returned to service as soon as possible. HSI's quick actions to repair the vehicle also reflected an impending funding cutoff. This "prioritiz[ation of] administrative expedience and the apparent need to avoid an impending funding cutoff" reflects nothing beyond negligence, and certainly not a conscious effort to disadvantage a defendant. (ER-12.)

Second, no record evidence shows that agents knew that the HSI vehicle had apparent exculpatory value. No discussion of its evidentiary value appears in emails between agents. Nor is there any discussion of defendant's impending trial or his defense strategy.

At most, the record reflects that agents *should have* recognized that the car could have been relevant evidence. But that is not enough to show bad faith. If it were, then the destruction of clothing and semen samples in *Youngblood* would also have been done in bad faith; surely

30

agents investigating sex crimes would understand that such evidence would be material. But the Supreme Court held that nothing about those samples was apparently *exculpatory*. *Youngblood*, 488 U.S. at 58. So too here. In fact, the evidence from the HSI vehicle may well have corroborated the government's view that defendant rammed his car into the HSI vehicle. Where nothing in the record suggests that evidence is obviously exculpatory and the evidence may have in fact been inculpatory, a finding of bad faith cannot be supported. *See Cunningham*, 345 F.3d at 812.

Third, ICE did not repair the ERO vehicle. If agents had interpreted defendant's statement that "they hit me" to mean that agents' vehicles hit him first, and those agents wished to suppress exculpatory evidence supporting defendant's story, they would have presumably repaired the ERO vehicle too. The fact that they did not shows that the repair of the HSI vehicle was done in good faith to ensure that HSI had sufficient service vehicles. *Cf. Downs v. Hoyt*, 232 F.3d 1031, 1038 (9th Cir. 2000) (destruction of handwritten notes not done in bad faith where " did retain reports on certain people who

31

eventually became defense witnesses" and "incorporated many of his notes into various reports").

Fourth, agents photographed the HSI vehicle before it was repaired. Again, if agents were attempting to prevent defendant from accessing exculpatory evidence, they would not have preserved some form of that evidence. *See Hoyt*, 232 F.3d at 1038. The fact that they did further demonstrates their good faith.

The district court's primary Ninth Circuit authorities, *Cooper* and *Zaragoza-Moreira*, do not support a different result. *Cooper* is distinguishable because agents were given specific information about the evidence that revealed its exculpatory value, and the government promised to preserve the evidence; accordingly, the government did not challenge the bad-faith finding or rely on agency policies to justify the loss of evidence. 983 F.2d at 930-31 & n.2. And *Zaragoza-Moreira* involved several factors indicating bad faith that are absent from this case. Those factors included (1) the nature of the evidence there—a video that an agent could have easily viewed to verify the defendant's claims about her actions—(2) the district court's findings that the agent's "actions were not merely negligent or reckless"; (3) the fact that

32

the video was not "destroyed in the normal course of the government's usual procedures"; (4) follow-up investigation that further corroborated the defendant's claims; and (5) an affidavit and multiple reports that omitted the defendant's claims about duress.  780 F.3d at 979-80.

All these factors are absent from this case.  This case involved a vehicle that, unlike video surveillance, had a non-evidentiary purpose: service in law enforcement.  And unlike video, the exculpatory value of that vehicle was not obvious to a non-expert in vehicular accidents.  Moreover, the HSI vehicle was repaired in accordance with agency policy, and the record reflects no follow-up investigation that corroborated defendant's claim.  Finally, while the district court noted that the complaint omitted defendant's statement "they hit me," the record does not show that agents knew that defendant was claiming that agents hit him first, and nothing in Federal Rule of Criminal Procedure 3 requires an agent to state a defendant's theory.  Fed. R. Crim. P. 3 (requiring only "a written statement of the essential facts constituting the offense charged").  Moreover, agents did not omit this statement from their report, which negates an inference that they were attempting to suppress information helpful to the defense.

For these reasons, the district court's decision must be reversed under either de novo or clear-error review. The consequences of the district court's decision underscore its illogical nature. If the decision below were correct, then law enforcement would be crippled from repairing service vehicles. That is a problem for ICE and HSI, who have limited spare vehicles to support hundreds of agents conducting immigration operations. But it would also be a problem for a local police department that may have only a few service vehicles. Regardless of how people view law enforcement efforts, they should not be able to hamper operations by damaging service vehicles and requiring those vehicles to be held hostage pending trial. The Court should not sanction a ruling with these implications.

## F. The Record Does Not Support a Finding of Bad Faith on the Prosecutor's Part

The district court declined to find that the prosecutor acted in bad faith, and for good reason. There is no evidence that before late October, the prosecutor knew about the repairs being done to the HSI vehicle. And upon being told that the defendant wanted to inspect the vehicle, she took prompt action to ascertain its status. Only then did

34

she find out about the repairs.  Thus, the prosecutor's actions do not provide an alternative basis for affirmance, and reversal is required.

## VI

## CONCLUSION

The judgment of the district court should be reversed.

DATED: April 10, 2026

Respectfully submitted,

TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division

*s/ Rajesh R. Srinivasan*

RAJESH R. SRINIVASAN
Assistant United States Attorney
Criminal Appeals Section

Attorneys for Plaintiff-Appellant
UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

The government states, pursuant to Ninth Circuit Rule 28-2.6, that it is unaware of any cases related to this appeal.

# CERTIFICATE OF COMPLIANCE

I certify that:

1.      This brief complies with the length limits permitted by Ninth Circuit Rule 32-1 because the brief contains 6,358 words, excluding the portions exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

DATED: April 10, 2026                    *s/ Rajesh R. Srinivasan*

RAJESH R. SRINIVASAN
Attorney for Plaintiff-Appellant
UNITED STATES OF AMERICA