No. 25-7261

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*

**v.**

JOSEPH BLANDON-SAAVEDRA,
*Defendant-Appellee*

---

Appeal from the United States District Court for the Central District of California, No. 5:25-cr-310-KK
The Honorable Kenly Kiya Kato

---

# APPELLEE'S ANSWERING BRIEF

---

AMY M. KARLIN
Interim Federal Public Defender
AVIEL MENTER
Deputy Federal Public Defender
Aviel_Menter@fd.org
321 East 2nd Street
Los Angeles, CA 90012-4202
(213) 894-2854 | Fax: (213) 894-0081

*Attorneys for Defendant-Appellee*

# TABLE OF CONTENTS

Page

INTRODUCTION ........ 1

ISSUES PRESENTED ........ 4

STATEMENT OF ADDENDUM ........ 5

STATEMENT OF THE CASE ........ 5

I. Factual Background ........ 5

A. Law Enforcement Agents Used Their Vehicles to Box in Mr. Blandon-Saavedra, Causing a Collision ........ 5

B. The Government Was Informed of Its Obligation to Produce All Physical Evidence ........ 8

C. After the Defendant's Discovery Request, the Government Repaired Special Agent Tomaselli's Vehicle, Destroying Its Value as Evidence ........ 11

D. The Government Failed to Adequately Respond to the Defense's Discovery Requests ........ 12

II. Procedural History ........ 14

A. The Defense Moved to Dismiss the Indictment Due to the Government's Bad-Faith Spoliation of Material Evidence ........ 14

B. The District Court Found That the Government Acted in Bad Faith and Dismissed Count 2 of the Indictment ........ 17

SUMMARY OF THE ARGUMENT ........ 20

STANDARDS OF REVIEW ........ 23

TABLE OF CONTENTS (cont.)

Page

ARGUMENT ........ 24

I. The Government Violated Mr. Blandon-Saavedra's Due Process Rights by Repairing the Service Vehicle before He Could Inspect It ........ 24

A. The District Court Did Not Clearly Err in Finding That the Government Acted in Bad Faith ........ 27

B. The District Court Applied the Correct Legal Framework ........ 38

C. The Government's Purported Compliance with Internal Policy Does Not Compel a Finding of No Bad Faith ........ 43

II. Alternatively, the Government's Violation of Rule 16 Supports Dismissal ........ 49

CONCLUSION ........ 52

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arizona v. Youngblood*, 488 U.S. 51 (1988) ........................ 14, 25, 34, 46

*Borden v. United States*, 593 U.S. 420 (2021) ....................................... 39

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................. 9

*Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146 (9th Cir. 2016) ....................................................................................... 26

*California v. Trombetta*, 467 U.S. 479 (1984) ................................ 25, 42

*Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir. 2003) ............................................................................................... 34

*Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022) .................................... 24, 37

*Downs v. Hoyt*, 232 F.3d 1031 (9th Cir. 2000) ..................................... 33

*Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) ............................ 24

*Giglio v. United States*, 405 U.S. 150 (1972) .......................................... 9

*Mitchell v. Goldsmith*, 878 F.2d 319 (9th Cir. 1989) ............................ 33

*Phillips v. Woodford*, 267 F.3d 966 (9th Cir. 2001) .............................. 33

*Smith v. Marsh*, 194 F.3d 1045 (9th Cir. 1999) .............................. 26, 43

*Staples v. United States*, 511 U.S. 600 (1994) ....................................... 7

*United States v. Alahmedalabdaloklah*, 94 F.4th 782 (9th Cir. 2024) ....................................................................................... 24

*United States v. Barton*, 995 F.2d 931 (9th Cir. 1993) ................ passim

*United States v. Bingham*, 653 F.3d 983 (9th Cir. 2011) ...................... 34

*United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993) ................. passim

TABLE OF AUTHORITIES (cont.)

Page(s)

*United States v. Del Toro-Barboza*, 673 F.3d 1136 (9th Cir. 2012) .......... 14, 33

*United States v. Dipp*, 581 F.2d 1323 (9th Cir. 1978) .......... 50

*United States v. Dring*, 930 F.2d 687 (9th Cir. 1991) .......... 32, 37

*United States v. Feola*, 420 U.S. 671 (1975) .......... 7, 28

*United States v. First*, 731 F.3d 998 (9th Cir. 2013) .......... 51

*United States v. Flyer*, 633 F.3d 911 (9th Cir. 2011) .......... 25, 35, 38

*United States v. Gee*, 695 F.2d 1165 (9th Cir. 1985) .......... 51

*United States v. Heffington*, 952 F.2d 275 (9th Cir. 1991) .......... 32, 37, 45

*United States v. Hernandez*, 109 F.3d 1450 (9th Cir. 1997) .......... 34, 37

*United States v. Hernandez-Meza*, 720 F.3d 760 (9th Cir. 2013) .......... 50, 51

*United States v. Holmes*, 163 F.4th 547 (9th Cir. 2025) .......... 40

*United States v. Robertson*, 895 F.3d 1206 (9th Cir. 2018) .......... passim

*United States v. Sivilla*, 714 F.3d 1168 (9th Cir. 2013) .......... passim

*United States v. Stennerson*, 150 F.4th 1276 (9th Cir. 2025) .......... 26, 43

*United States v. Working*, 224 F.3d 1093 (9th Cir. 2000) (en banc) .......... 40

*United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015) .......... passim

**Statutes**

18 U.S.C. § 111 .......... passim

18 U.S.C. § 3500 .......... 9

TABLE OF AUTHORITIES (cont.)

Page(s)

**Other Authorities**

U.S. Const. amend. V ........................................................................ passim

**Rules**

Federal Rule of Criminal Procedure 16............................................ 16, 49

# INTRODUCTION

This case arises from a vehicle collision. But the government has spoliated the most important piece of evidence: the vehicle that it accused Joseph Blandon-Saavedra of striking. Almost immediately after the collision, the government had the vehicle repaired. And the government went through with that repair even though it had received a defense request to preserve all physical evidence, even though it knew that Mr. Blandon-Saavedra claimed the law enforcement vehicle had actually hit him, and even though it knew that the damaged vehicle was evidence from which the true chain of events could potentially be reconstructed.

After a hearing and extensive factfinding, the district court determined that the government had spoliated the evidence in bad faith. The court noted that the government knew of Mr. Blandon-Saavedra's defense from the beginning, and—particularly given the investigating agent's extensive law enforcement experience—also knew that the government vehicle was potentially exculpatory evidence in this vehicle collision case. The district court therefore found that the government violated the due process clause by spoliating potentially

exculpatory evidence in bad faith. ER-10–12. It then dismissed one count of a two-count indictment based on that violation. ER-14. The court also pointed out that the Assistant United States Attorney ("AUSA") had never informed the Department of Homeland Security ("DHS") agents of their discovery obligations, and further concluded that the government likely violated Federal Rule of Criminal Procedure 16 by failing to make the unrepaired vehicle available for inspection when it was material to Mr. Blandon-Saavedra's defense. ER-8, 13–14.

The bad faith finding is the only aspect of the district court's ruling the government challenges in this appeal. *E.g.*, Op. Br. 3. But that finding is reviewable only for clear error. And the district court did not err here, much less clearly so. Its finding of bad faith was supported by extensive record evidence regarding the timeline on which the vehicle was repaired, the reasons the government rushed to repair it, and the government's knowledge of its potential usefulness to the defense. The government leaves these factual findings essentially unchallenged, and thus has failed to meet its burden as the appellant. This Court's precedent makes clear that, under such facts, a finding of

bad faith is permitted—or even compelled. *See United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015).

Instead, in an attempt to evade the deferential clear error standard for factual findings, the government accuses the district court of legal errors it did not make. For example, the government insists that the district court found mere negligence or recklessness enough to constitute bad faith. Op. Br. 28–29. But the district court did no such thing; it expressly found that the government's actions "amounted to 'a conscious effort to suppress exculpatory evidence'"—not just a negligent or reckless one. ER-12 (quoting *Zaragoza-Moreira*, 780 F.3d at 980). The government also argues that it cannot be held responsible for its spoliation of evidence when it was merely complying with departmental policies. Op. Br. 22–23. But the government does not actually identify any policy or regulation that compelled its rush to repair the vehicle, and the timing of the vehicle repair is the exact problem in this case. Under such circumstances, purported compliance with inapposite (and undocumented) internal policies cannot excuse the government's due process violation.

Because the district court's finding of bad faith was not clearly erroneous, and because that is the only aspect of the district court's ruling the government has appealed, this Court should affirm. Alternatively, the Court can affirm the dismissal of Count 2 because the government also violated Federal Rule of Criminal Procedure 16. The government does not challenge the district court's finding of a likely Rule 16 violation. And dismissal is an appropriate remedy because the government's spoliation of the vehicle has left Mr. Blandon-Saavedra with no comparable alternative evidence to rebut the charge. At a minimum, if this Court does not simply affirm the district court's dismissal of Count 2 based on the government's due process violation, the Court should remand to the district court to determine the remedy for the now-uncontested Rule 16 violation.

## ISSUES PRESENTED

1. Did the district court clearly err when it found that government agents acted in bad faith by sending the government vehicle that Mr. Blandon-Saavedra allegedly hit to be repaired before defense counsel could inspect it, even though defense counsel had specifically requested that the government preserve all physical

evidence, and even though the government knew Mr. Blandon-Saavedra was contesting the agents' version of events and that the vehicle was evidence of what had occurred?

2. As an alternative ground for affirmance, is dismissal of Count 2 with prejudice appropriate relief for the government's now-undisputed violation of Federal Rule of Criminal Procedure 16?

## STATEMENT OF ADDENDUM

Under Ninth Circuit Rule 28-2.7, an addendum setting forth the statutes and rules relevant to this appeal is filed concurrently with this brief.

## STATEMENT OF THE CASE

### I. Factual Background

#### A. Law Enforcement Agents Used Their Vehicles to Box in Mr. Blandon-Saavedra, Causing a Collision

On September 5, 2025, the government filed a complaint charging Mr. Blandon-Saavedra with two counts of assaulting a federal officer with a deadly and dangerous weapon in violation of 18 U.S.C. § 111(a)(1), (b). ER-159.[1] The complaint was supported by an affidavit of

[1] The complaint does not specify the deadly and dangerous weapon, but the later indictment makes clear that the deadly and (Continued . . .)

probable cause from HSI Special Agent Julius Garcia. ER-159–64. The affidavit alleged that, on September 4, five agents from the Department of Homeland Security waited outside of Mr. Blandon-Saavedra's home until he left in his car. ER-161–62. The agents then used their vehicles to "box in" Mr. Blandon-Saavedra. ER-162–63. The government alleged that, after he was boxed in, Mr. Blandon-Saavedra committed the charged assaults by reversing his car into a vehicle driven by Officer Marco Perera, and then driving his car forward into a vehicle driven by Special Agent Bradley Tomaselli. ER-162–63. The agents arrested Mr. Blandon-Saavedra at the scene of the vehicle collision. ER-164.

The government procured an indictment from a grand jury on September 24, 2025, charging the first alleged collision as Count 1, and the second alleged collision as Count 2, both in violation of 18 U.S.C. § 111(a), (b). ER-157–58. Section 111(b) carries a potential penalty of up to 20 years in prison.

Since right after his arrest, Mr. Blandon-Saavedra has disputed the government's allegations. At 1:25 pm on September 4, just a few

---

dangerous weapon the government alleges Mr. Blandon-Saavedra to have used was a vehicle. ER-157–58.

hours after the collision, HSI Special Agent Garcia interviewed Mr. Blandon-Saavedra. SER-4–5. Special Agent Garcia told Mr. Blandon-Saavedra that "the agents were there to discuss the incident that occurred earlier that day," to which Mr. Blandon-Saavedra responded, "they hit me." SER-5. Special Agent Garcia did not mention this statement in his affidavit to the court in support of the criminal complaint, but did include the statement in his report of investigation that went to prosecutors. ER-159–64; SER-5.

The government was accordingly aware from the day of the arrest that Mr. Blandon-Saavedra's intent would be at issue. As an initial matter, the government is unquestionably aware that *mens rea* is an essential element of almost all criminal charges, including a charge under 18 U.S.C. § 111. *Staples v. United States*, 511 U.S. 600, 605 (1994) ("[W]e must construe the statute in light of the background rules of the common law, in which the requirement of some *mens rea* for crime is firmly embedded." (citation omitted)); *United States v. Feola*, 420 U.S. 671, 686 (1975) (18 U.S.C. § 111 "does require a criminal intent"). And, on the same day the government arrested Mr. Blandon-Saavedra, he told Special Agent Garcia that the agents had hit him,

SER-5, thereby explicitly and personally notifying law enforcement of a potential defense.

Further, at the initial detention hearing on September 4, Magistrate Judge Sheri Pym observed that, even if Mr. Blandon-Saavedra had struck the officers, it was not clear whether he was "knowingly trying to . . . smash . . . into a law enforcement car":

> So, it's hard to know based on . . . what I see here. You know, what was in his mind at the time. And it's a case that—you know, *it could have been confusion*, it could have been very deliberate, and certainly there's no excuse for anybody knowingly trying to, you know, essentially smash their car into a law enforcement car. . . . I'm sort of left with the fact that there are—*it can be interpreted in different ways* and certainly it's not my place here to make that determination.

SER-30 (emphasis added). By numerous means, then, the government was aware since the beginning of the case that there would be a dispute regarding whether Mr. Blandon-Saavedra intentionally struck the government vehicles.

### B. The Government Was Informed of Its Obligation to Produce All Physical Evidence

At the September 4, 2025, detention hearing, the Magistrate Judge ordered the government to comply with its discovery obligations, and warned the government of the consequences if it failed to do so:

> The prosecutor is ordered to comply with their discovery obligations under *Brady v. Maryland* and its progeny and is reminded of the possible consequences of not doing so, including the exclusion of evidence, adverse jury instructions, *dismissal of charges*, contempt, referral to a disciplinary authority and sanctions.

SER-23–24 (emphasis added). The government accordingly has been aware since the beginning of the case that failing to fulfill its constitutional discovery obligations could result in dismissal.

On September 8, 2025—just three days after the criminal complaint was filed—defense counsel sent the government a "formal request for discovery pursuant to all court rules, codes, statutes, and case law, including Federal Rules of Criminal Procedure 12, 16, and 26, *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the Jencks Act (18 U.S.C. § 3500)." ER-128. The discovery request covered "all discoverable information within the possession, custody, or control of the government, and which is known to the government or by the exercise of due diligence may become known to the government." ER-128. And the request specifically included "[a]ll physical evidence pertaining to this case," and requested an opportunity to "inspect, copy, and/or test all tangible objects . . .

which are material to the preparation of Mr. Blandon-Saavedra's defense." ER-130.

The district court again ordered the government to comply with its discovery obligations at the September 30, 2025, arraignment.[2] Magistrate Judge David T. Bristow advised the government of its "continuing obligation to produce all information or evidence known to the Government that is relevant to the guilt or punishment of a defendant, including but not limited to exculpatory evidence." SER-11. The court therefore "order[ed] the Government to produce to the Defendant in a timely manner all information or evidence known to the Government that is either, one, relevant to the Defendant's guilt or punishment or, two, favorable to the Defendant on the issue of guilt or punishment." SER-11. The court explicitly warned the government that failing to comply with these obligations could result in "[c]ontempt, sanction, referral to a disciplinary authority, adverse jury instruction,

---

[2] As explained below, *infra* Parts C–D, the arraignment took place after the government sent the vehicle to the repair shop on September 16, 2025, but before the government informed defense on October 28, 2025, that the vehicle had been repaired. ER-71, 141. The government acknowledged before the district court that, had it instructed the repair shop to stop the repairs, that instruction "100 percent" would have been followed "if the repairs had not [yet] been made." ER-204.

exclusion of evidence, and/or *the dismissal of charges*." SER-11–12 (emphasis added).

### C. After the Defendant's Discovery Request, the Government Repaired Special Agent Tomaselli's Vehicle, Destroying Its Value as Evidence

At 2:30 p.m. on September 4, 2025—on the same day as the vehicle collision but also one hour *after* Mr. Blandon-Saavedra's post-arrest interview with Special Agent Garcia—Supervisory Special Agent Micah Spooner-Wyman sent an email to Jose Cervantes, who handles fleet management for the HSI Los Angeles office. ER-57; SER-4–5. Special Agent Spooner-Wyman asked about the "current procedure . . . for damage assessments/estimates, financial liability to this arrestee or his/her insurance company, and subsequent repair process recommendations." ER-59. Mr. Cervantes responded a few hours later, telling Special Agent Tomaselli to get an estimate for repairs. ER-56.

HSI received three estimates on September 11 and September 15, 2025. ER-48–51; ER-62–82. Disregarding the defense's discovery request made several days prior, as well as the court's oral discovery order on September 5, SER-23–24, Special Agent Spooner-Wyman proceeded with the vehicle repair. ER-55. On September 15, 2025,

Special Agent Spooner-Wyman sent Mr. Cervantes an email asking if he needed any additional information to get the repairs "over the hurdle before the money shuts off tomorrow." ER-55. Mr. Cervantes explained that he needed the Fleet Card Transaction Worksheet ("FCTW") "as soon as possible" so that "HQ" would have time to approve it. ER-54; ER-86. Special Agent Tomaselli submitted the FCTW later that afternoon. ER-52–53. The repair request was approved on September 16, and the government provided the car to the repair shop that day. ER-71; ER-83–84.

### D. The Government Failed to Adequately Respond to the Defense's Discovery Requests

The government responded to the defense's written September 8 discovery request on October 1. ER-135. The government produced no physical evidence and instead turned over only three items: a collection of incident reports, an Instagram video, and Mr. Blandon-Saavedra's statement. ER-135. The government also promised to make available "any other evidence seized from" Mr. Blandon-Saavedra, and any evidence "which the government intends to offer in its case-in-chief." ER-135.

On October 27, 2025, defense counsel emailed AUSA Courtney Williams asking for "the dates and times this week when we may conduct an inspection of all vehicles present at the scene with our investigator." ER-144. AUSA Williams responded that she had "reached out to the agent" to "find out where the vehicles are located." ER-142–43. AUSA Williams provided a further response the next day, stating that "the agent said that one of the vehicles had been repaired." ER-141.

Defense counsel replied to the government on October 29, explaining that Mr. Blandon-Saavedra would need to seek relief from the court. ER-139. Defense counsel emphasized that "one of the vehicles involved in the alleged collision (a physical item of evidence) has been materially altered and destroyed as a piece [of] usable evidence that cannot be now inspected unaltered from the time of the incident." ER-139. Counsel therefore stated that it would be "moving to dismiss the indictment with prejudice based on a Trombetta/Youngblood due process violation, a violation of Rule 16 and the Court's criminal standing order, Section II." ER-139.

## II. Procedural History

### A. The Defense Moved to Dismiss the Indictment Due to the Government's Bad-Faith Spoliation of Material Evidence

Mr. Blandon-Saavedra moved to dismiss the indictment on the grounds that the government's spoliation of evidence violated his due process rights and Rule 16. ER-101–02, 115. The motion explained that spoliation of evidence can violate the due process clause in one of two circumstances. ER-113–14. First, the when the government destroys "material exculpatory evidence," it violates the defendant's constitutional rights regardless of its intent. ER-113; *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1149 (9th Cir. 2012). Second, the government may not destroy "[p]otentially useful evidence," such as evidence that "could have been subjected to tests, the result of which might have exonerated the defendant." ER-113–14; *Zaragoza-Moreira*, 780 F.3d at 978 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). In the latter instance, the government's actions violate the due process clause when they are undertaken in "bad faith." ER-114.

Mr. Blandon-Saavedra argued that Special Agent Tomaselli's vehicle was at least potentially useful evidence. ER-117–20. The motion

explained that the damage to the vehicle could have shown who struck whom, thereby indicating whether Mr. Blandon-Saavedra acted with the intent to strike the government vehicles. ER-118–19. The inspection could have confirmed Mr. Blandon-Saavedra's near-contemporaneous statement to law enforcement that the agents had struck him. ER-118.

Mr. Blandon-Saavedra also provided a declaration from counsel regarding a consultation with an expert in collision reconstruction, Robert W. Snook. ER-29. Mr. Snook stated that he "could not offer any professional or scientifically reliable opinion without examining the unrepaired vehicle in person." ER-29. He explained that photographs alone were not enough: "a physical inspection is necessary to evaluate the vehicle's crush profiles, paint transfer, deformation patterns, and mechanical damage angles in order to determine direction, force, and sequence of impact." ER-29. Mr. Snook stated that, without access to the unrepaired vehicle, "it is almost impossible to tell who caused the collision." ER-30. Nor could Mr. Snook arrive at "any forensic, fact-based opinion by examining the repaired vehicle along with the available photographs." ER-30. Accordingly, without the unrepaired vehicle, "there would be nothing to testify to." ER-29.

Mr. Blandon-Saavedra further argued that the government's violation of Federal Rule of Criminal Procedure 16 separately warranted dismissal. ER-124–25. Under Rule 16, the government was obligated to "permit the defendant to inspect . . . tangible objects . . . within the government's possession, custody, or control" when "the item is material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E). The motion explained that Special Agent Tomaselli's service vehicle was under the government's control, because the government submitted it for repair. ER-124. And the vehicle was relevant to the defense, as it could show that Mr. Blandon-Saavedra did not intentionally strike the vehicle as charged. ER-118; ER-124.

The district court held a hearing on the motion on November 10, 2025. ER-165. During the hearing, the government initially argued that it had no reason to know the vehicle in particular should have been included among the evidence it preserved. *See* ER-192–93. But the district court explained that the vehicle plainly had potentially exculpatory value: "It's basic. . . . [Y]ou don't need to be a lawyer to know the evidentiary value of the actual vehicles in a case where the collision is the subject of litigation, and that's what we have here." ER-

193. The government then "concede[d] . . . that the evidence in this case could potentially be useful for [a] defense attorney." ER-198. And it acknowledged that the prosecutor had "never asked the agents to preserve the vehicle." ER-190.

### B. The District Court Found That the Government Acted in Bad Faith and Dismissed Count 2 of the Indictment

The district court issued an order on November 14, 2025, dismissing Count 2 of the indictment with prejudice. ER-4–14. The court found it undisputed that Special Agent Tomaselli's unrepaired vehicle was potentially useful evidence, because it could have shown that the agents in fact hit Mr. Blandon-Saavedra first, and that Mr. Blandon-Saavedra lacked the necessary intent to sustain a § 111(a)(1), (b) conviction. ER-10. The court also noted that examination of the vehicle could have shown that Mr. Blandon-Saavedra's actions "were a reasonable response to excessive force by a government agent." ER-10.

The court made a finding of fact that the government's failure to preserve the vehicle evidence was in bad faith. ER-10–12. The court explained that the government acts in bad faith when it has "knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." ER-10 (quoting *Zaragoza-Moreira*, 780 F.3d at 977).

Here, the government knew that Special Agent Tomaselli's vehicle had exculpatory value because Mr. Blandon-Saavedra told Special Agent Garcia immediately after the collision that the law enforcement agents had hit him. ER-11. The court found that Special Agent Garcia's inclusion of this statement in his report indicated that he knew its significance. ER-11. And the court emphasized that Special Agent Garcia's extensive training in law enforcement made him aware that the unrepaired vehicle would have provided evidence potentially helpful to Mr. Blandon-Saavedra's defense. ER-11.

The district court rejected the government's argument that it was merely following its own policies, explaining that "[a]dherence to standard policies and procedures does not disprove bad faith." ER-12. The court emphasized that the government was "aware of Mr. Blandon-Saavedra's defense claim," but "at best" chose to "prioritize[] administrative expedience and the apparent need to avoid an impending funding cutoff over its constitutional duty to preserve exculpatory evidence." ER-12.

The district court next found that there was no comparable evidence available. ER-12–13. The court explained that photographs

were not comparable because they merely showed that the cars were damaged in a collision—not who hit whom. ER-12. The court credited the uncontradicted statements of the potential expert witness proffered in defense counsel's declaration that a physical inspection would be necessary to "evaluate the vehicle's crush profiles, paint transfer, deformation patterns, and mechanical damage angles in order to determine direction, force, and sequence of impact." ER-12–13. The court therefore concluded that the government violated Mr. Blandon-Saavedra's right to due process by destroying potentially useful evidence in bad faith when no comparable evidence was available. ER-13. As a remedy for the due process violation, the district court dismissed Count 2 of the indictment. ER-13. It declined to dismiss Count 1, relating to the other government vehicle. ER-14.

Separately, the court found that the government also likely violated Federal Rule of Criminal Procedure 16. ER-13–14. The court emphasized that government counsel conceded that they never asked HSI agents to preserve the vehicle. ER-13. And the court rejected the government's argument that the defense had failed to specifically request access to the vehicle in its September 8 letter. ER-14. The court

explained that "nothing in Rule 16 requires a defendant to request preservation of individual pieces of evidence." ER-14. The court declined to determine the appropriate remedy for the government's likely Rule 16 violation, however, as it had already dismissed Count 2 with prejudice due to the government's due process violation. ER-14 n.10.

## SUMMARY OF THE ARGUMENT

I. The district court did not clearly err in finding that the government acted in bad faith when it repaired the government vehicle at issue in Count 2 of the indictment.

A. A failure to preserve potentially exculpatory evidence is unconstitutional when the government acts in bad faith—that is, when the government is aware of the evidence's potential exculpatory value and nonetheless does not preserve it. Here, the district court found that the government was aware that Special Agent Tomaselli's unrepaired vehicle had potentially exculpatory value because, on the very same day the incident took place, Mr. Blandon-Saavedra told the government that the agents had hit him, and it would have been apparent to the experienced investigator handling the case that the vehicle had evidentiary value for that defense. Further, the Magistrate Judge's

comments at the initial detention hearing made clear to the government that there was likely to be a dispute about whether Mr. Blandon-Saavedra had intentionally hit the vehicle. The government therefore knew that the vehicle, if examined, could support Mr. Blandon-Saavedra's defense. The district court's finding of bad faith accordingly was not erroneous, much less clearly so.

None of the government's cases is to the contrary. In virtually every case on which the government relies, the defendant had done nothing to alert the government to the importance of the evidence at issue. Here by contrast, Mr. Blandon-Saavedra immediately informed the government of his potential defense, which plainly depended on the vehicle for evidentiary support. Additionally, in nearly all of the government's cited cases, this Court deferred to the district court's finding of bad faith. In this case, by contrast, to succeed in its appeal, the government must overcome the required deference by showing clear error. It has made no such showing here.

B. The government accuses the district court of finding that negligence or recklessness amounted to bad faith. To the contrary, the district court expressly stated that the government acted with

knowledge, *not* negligence or recklessness, because it knew that Special Agent Tomaselli's service vehicle was potentially useful to the defense before it had that vehicle repaired. The fact that the government prioritized its budgetary concerns over its constitutional due process and discovery obligations is an indication of bad faith, not mere negligence. Nor did the district court have to rely on Mr. Snook's expertise to demonstrate the exculpatory value of the evidence. Mr. Snook opined only on the lack of alternative evidence—a separate element of Mr. Blandon-Saavedra's claim that is not disputed on appeal. The government also insists that it lacked any subjective intent to frustrate Mr. Blandon-Saavedra's defense. But this kind of subjective intent is not required; knowledge of the evidence's potentially exculpatory value before its spoliation is enough. *See, e.g.*, *Zaragoza-Moreira*, 780 F.3d at 978–79.

C. The district court correctly held that the government's purported compliance with its own procedures does not preclude a finding of bad faith. As an initial matter, the policies to which the government points in no way required or directed it to repair the vehicle before the defense had a chance to examine it. Those policies

accordingly provide the government no defense here. And in any event, this Court's cases at most suggest that internal policies may provide "an *indication* that the disposal of evidence was not performed in bad faith." *United States v. Barton*, 995 F.2d 931, 935 (9th Cir. 1993) (emphasis added) (internal quotation marks omitted). They do not hold that such policies *preclude* a finding of bad faith.

II. Alternatively, Rule 16 supports dismissal with prejudice. The government does not appeal the district court's finding that it likely violated Rule 16. And because the government spoliated evidence essential to Mr. Blandon-Saavedra's defense, dismissal with prejudice is necessary to remedy that violation. If it does not simply affirm, at a minimum, this Court should remand to the district court to determine the appropriate remedy for the now-uncontested Rule 16 violation in the first instance.

## STANDARDS OF REVIEW

This Court reviews de novo a due process claim involving the government's failure to preserve potentially exculpatory evidence, but reviews factual findings, including as to bad faith, for clear error. *United States v. Robertson*, 895 F.3d 1206, 1211 (9th Cir. 2018). "Clear

error exists if the finding is 'illogical, implausible, or without support in inferences that may be drawn from the facts in the record.'" *Doe v. Snyder*, 28 F.4th 103, 106 (9th Cir. 2022) (quoting *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784-85 (9th Cir. 2019)). When "the district court's findings are plausible in light of the entire record," this Court "may not reverse, even if [it] would have weighed the evidence differently." *Meza-Carmona v. Garland*, 113 F.4th 1163, 1168 (9th Cir. 2024) (quoting *Lewis v. Ayers*, 681 F.3d 992, 998 (9th Cir. 2012)).

This Court "review[s] for abuse of discretion the district court's discovery . . . rulings under Rule[] 16." *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 837 (9th Cir. 2024).

## ARGUMENT

### I. The Government Violated Mr. Blandon-Saavedra's Due Process Rights by Repairing the Service Vehicle before He Could Inspect It

"The government violates the defendant's right to due process" when it fails to preserve evidence with "'exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *United States v. Cooper*, 983 F.2d

928, 931 (9th Cir. 1993) (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)). "Another configuration of this test requires the showing of bad faith where the evidence is only potentially useful and not materially exculpatory." *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013); *see also Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

"*Youngblood's* bad faith requirement dovetails with the first part of the *Trombetta* test: that the exculpatory value of the evidence be apparent before its destruction." *Zaragoza-Moreira*, 780 F.3d at 977 (quoting *Cooper*, 983 F.2d at 931). In other words, "[t]he government's failure to preserve potentially exculpatory evidence rises to the level of a due process violation if a defendant can show that the government acted in bad faith." *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) (citing *Youngblood*, 488 U.S. at 58).

The government conceded before the district court that Special Agent Tomaselli's vehicle was potentially exculpatory evidence, because further testing could have revealed that Special Agent Tomaselli hit Mr. Blandon-Saavedra first. ER-10; ER-198. Additionally, the district court found that no comparable evidence was reasonably available, because an examination of the vehicle itself was "necessary to properly

investigate and provide evidence and testimony regarding which vehicle hit the other first." ER-12. The government chose not to contest either of these findings on appeal, and accordingly has waived any challenge to them. *See United States v. Stennerson*, 150 F.4th 1276, 1281 n.1 (9th Cir. 2025) ("We generally do not consider issues that are not raised in the appellant's opening brief.") (quoting *Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146, 1148 (9th Cir. 2016)); *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("Furthermore, on appeal, arguments not raised by a party in its opening brief are deemed waived.").

Instead, the government argues only that it did not act in bad faith. Op. Br. 3, 21–34. The district court's finding of bad faith, however, is a finding of fact reviewable only for clear error. *E.g.*, *Robertson*, 895 F.3d at 1211. And that finding was supported by extensive evidence showing that the government was informed of Mr. Blandon-Saavedra's potential defenses, and understood that the HSI vehicle could provide potentially useful evidence in support of those defenses, but spoliated the vehicle nonetheless. ER-10–12. Such evidence is more than sufficient to support a finding of bad faith, especially on clear error

review. *See, e.g.*, *Zaragoza-Moreira*, 780 F.3d at 977–81. This Court should affirm.

### A. The District Court Did Not Clearly Err in Finding That the Government Acted in Bad Faith

"[T]he presence or absence" of bad faith "'turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed.'" *Sivilla*, 714 F.3d at 1172 (quoting *Cooper*, 983 F.2d at 931). In other words, the government violates due process when it has "knowledge of the potentially exculpatory value" of the evidence "before it [i]s destroyed." *Zaragoza-Moreira*, 780 F.3d at 979. The timing therefore is critical.

The district court did not err, let alone clearly err, in finding that the government was aware of the potential exculpatory value of Special Agent Tomaselli's vehicle before the government repaired it. As the district court explained, Mr. Blandon-Saavedra told Special Agent Garcia that the government vehicle had hit him. ER-11; SER-5. Special Agent Garcia "understood the significance of this statement," as he included it in his report. ER-11; SER-5. Additionally, the court explained to the government at the detention hearing that Mr. Blandon-Saavedra's intent was at issue. SER-30. This is not just because a

person may be "justified in exerting an element of resistance" if he did not recognize his assailants as law enforcement officers, *Feola*, 420 U.S. at 686, but also because a person must have the "criminal intent" to commit assault to violate 18 U.S.C. § 111 in the first instance. In short, the government has known since the very beginning of the case that evidence regarding the circumstances of the collision could be helpful to the defense, and thus was, at a minimum, potentially exculpatory evidence.

The government has argued that, even if it was aware of Mr. Blandon-Saavedra's defense, it did not know that the unrepaired vehicle would be material to that defense. *E.g.*, Op. Br. 24; ER-201. But the district court correctly rejected this attempt to feign ignorance. The district court emphasized Special Agent Garcia's "extensive training and experience in criminal investigation." ER-11. Special Agent Garcia's probable cause affidavit explained that he has "participated in numerous investigations," has "conducted or assisted in the arrests of numerous subjects and conducted interviews with victims, witnesses, suspects, and informants," has "participated in several static and mobile surveillance activities," and has "assisted in the execution of

search warrants." ER-161. Special Agent Garcia also received 13 weeks of training in the "Criminal Investigator Training Program," and received further "specialized training" in several additional areas. ER-160–61. "Given this depth of experience," the district court found that Agent Garcia "surely understood his professional and constitutional duty" to preserve the service vehicle. ER-11. The government has no response to this finding, and makes no argument on appeal that it was erroneous (much less clearly so).

On the contrary, this Court's decisions confirm that these facts permit (or even require) a finding of bad faith. For example, in *United States v. Zaragoza-Moreira*, this Court reversed a district court's finding of no bad faith when the government had automatically taped over video evidence that could have supported the defendant's claim of duress. 780 F.3d at 974. In that case, the defendant was interviewed and then arrested at a border crossing for attempting to smuggle controlled substances. *Id.* at 974–75. The defendant explained that she had been forced to smuggle the drugs, and was acting deliberately suspiciously in line at the border because she "wanted [the authorities] to notice [her.]" *Id.* at 975–76 (modifications in original). But by the

time the district court ordered the government to turn over video of the defendant waiting in line, it had already been taped over. *Id.* at 976–77. The district court found that the evidence was not spoliated in bad faith, but this Court reversed. *Id.* at 978. The Court noted that the government omitted the defendant's claim of duress from most of the reports it submitted to the district court. *Id.* at 976, 980. And it found "[e]ven more disturbing" that the interviewing agent's "probable cause statement supporting the criminal complaint . . . did not include any reference to [the defendant's] claims of duress." *Id.* at 980. The Court also faulted the AUSA for failing to take any action in response to a "letter from defense counsel requesting the preservation of video evidence," and for "fail[ing] to notify [HSI] of [the defendant's] request to preserve the video evidence." *Id.* at 980–81.

Similarly, in *United States v. Cooper*, the district court found that the government acted in bad faith when it destroyed laboratory equipment allegedly used to manufacture methamphetamine. 983 F.2d at 929–31.[3] Affirming the bad faith finding on appeal, this Court

---

[3] The government in *Cooper* did not challenge the bad faith finding on appeal. *Id.* at 931. And the government here concedes that the facts of *Cooper* supported a finding of bad faith. Op. Br. 25.

emphasized that the "equipment's value as potentially exculpatory evidence was repeatedly suggested to government agents." *Id.* at 931. In particular, government agents knew that the lab was used to manufacture another pharmaceutical, and knew that the defendants claimed the equipment at issue was "structurally incapable of methamphetamine manufacture." *Id.*

The same reasoning applies here. The agent who interviewed Mr. Blandon-Saavedra was immediately alerted to his potential defense: that the government agents hit him. *See Zaragoza-Moreira*, 780 F.3d at 979; *Cooper*, 983 F.2d at 931; SER-5. The government nevertheless failed to mention this defense in its probable cause statement. ER-159–64; *Zaragoza-Moreira*, 780 F.3d at 980. The government also received a timely request to preserve evidence. ER-128–30; *Zaragoza-Moreira*, 780 F.3d at 980–81. But the AUSA took no action in response to that request, and the evidence was destroyed.[4] ER-141; *Zaragoza-Moreira*,

---

[4] The government incorrectly states that the district court declined to find that the AUSA acted in bad faith. Op. Br. 34. This mischaracterizes the district court's ruling. In truth, the district court simply declined to find "whether the prosecution's actions, or lack thereof, separately constitute a due process violation." ER-14 n.10. This is not because it found that the AUSA acted without bad faith, but

(Continued . . .)

780 F.3d at 980–81; *Cooper*, 983 F.2d at 931. Very similar facts were sufficient to *compel* a finding that the district court clearly erred by not finding bad faith in *Zaragoza-Moreira*. 780 F.3d at 978. The facts here are certainly sufficient to *affirm* on clear error review a district court's finding of bad faith.

The government's unreasoned, unexplained string citation contains nothing to the contrary. Op. Br. 21. In most of those cases, in direct contrast to this one, the government had no information suggesting that the evidence at issue had potentially exculpatory value until after the evidence was destroyed. *See, e.g.*, *United States v. Heffington*, 952 F.2d 275, 281 (9th Cir. 1991) (affirming finding of no bad faith when defendant did "not claim that the government knew that [any] . . . test would exculpate him" (internal quotation marks omitted)); *United States v. Dring*, 930 F.2d 687, 694 (9th Cir. 1991) (rejecting "a

---

because the question of the presence or absence of bad faith is not decided on an individual basis in the first instance. *See Zaragoza-Moreira*, 780 F.3d at 980 (explaining that the agent who interviewed the defendant "should not have been the only relevant actor in the court's bad faith analysis," because the "AUSA's actions, or lack thereof" were also relevant). As in *Zaragoza-Moreira*, both the agents' and the AUSA's actions here are relevant to the bad faith analysis. *Id.* at 980–81.

presumption that the Government acted in bad faith"); *Sivilla*, 714 F.3d at 1171–72 (affirming a finding that the government did not sell a Jeep in bad faith where "[a]ny exculpatory value of the Jeep itself was not apparent" and the defendant did not explain why the evidence was relevant until after it was made unavailable); *Phillips v. Woodford*, 267 F.3d 966, 972, 987 (9th Cir. 2001) (in habeas context, upholding the denial of an evidentiary hearing when the petitioner did not present "any reason to believe that the exculpatory value" of a car "was apparent prior to its destruction"—and indeed only admitted he was at the scene of the crime after trial); *Mitchell v. Goldsmith*, 878 F.2d 319, 322 (9th Cir. 1989) (no bad faith in failure to preserve a semen sample, where failure occurred weeks before the defendant was even identified and arrested); *Del Toro-Barboza*, 673 F.3d 1149 (rejecting an argument that the government acted in bad faith by destroying evidence despite "an order for the preservation of evidence," because the box at issue was lost before any such order was requested or entered and "[t]estimony during trial show[ed] that as events unfolded no one present considered the [evidence] to have any evidentiary value"); *see also Downs v. Hoyt*, 232 F.3d 1031, 1038 (9th Cir. 2000) (holding without elaboration that

defendant "failed to show that" undisclosed investigation notes "had potential exculpatory value").

In other cases cited by the government, Op. Br. 21, the presence or absence of bad faith was not the subject of the parties' dispute or the court's decision. *See United States v. Hernandez*, 109 F.3d 1450, 1455 (9th Cir. 1997) (defendant "d[id] not even challenge the district court's finding that the government did not act in bad faith in destroying the gun"); *United States v. Bingham*, 653 F.3d 983, 994–95 (9th Cir. 2011) (claim rejected due to availability of "comparable evidence," without any discussion of bad faith). In one case, the Court reversed a denial of qualified immunity when the government merely failed to create or gather evidence, rather than spoliating existing evidence. *See Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003) (officer "failed to gather any physical evidence" and "fail[ed] to document his interrogations"); *see also Youngblood*, 488 U.S. at 59 (no due process violation "when the police fail to use a particular investigatory tool"). And in some cases, the government took steps to attempt to preserve evidence, but fell short by accident. *See Barton*, 995 F.2d at 935–36 (officer accidentally destroyed marijuana by placing it in

unventilated plastic bags, but "believed the plastic bags were ventilated"); *Flyer*, 633 F.3d at 916 (affirming a finding of no bad faith when an officer "did not intentionally corrupt data on the [defendant's] laptop hard drive, but rather mishandled it," and then "voluntarily dismissed the count in the indictment relating to possession of child pornography on the basis of the . . . laptop"). These cases have no bearing on the circumstances here, in which the government knew of the potential exculpatory value of the evidence, but nonetheless intentionally took action that spoliated it.

The government also relies heavily on *Robertson*, 895 F.3d 1206, *see* Op. Br. 26–27, but that case too is inapposite. In *Robertson*, the defendant argued that the government violated her due process rights when it failed to preserve from automatic erasure surveillance video of her car, into which she had allegedly placed stolen mail. *Robertson*, 895 F.3d at 1210–11. The defendant argued that this video could have "'conclusively shown' who had access to her vehicle" when the mail was placed in it. *Id.* at 1211. This Court affirmed the district court's finding of no bad faith, explaining that although a government agent "was made aware of the possible existence of the . . . video, the record does

not show he had knowledge of the video's apparent exculpatory value at the time it was deleted, or that he knew of the automatic 30-day deletion process." *Id.* The agent had also testified that the footage "offered only a partial view that would not have shown someone gaining access to the trunk and, in any event, would not have allowed conclusive identification of any specific individual seen on camera." *Id.* at 1211–12. This Court therefore concluded that "the district court did not clearly err in finding [the agent] did not act in bad faith." *Id.* at 1212.

*Robertson's* facts stand in sharp contrast to this case. First, the Court in *Robertson* properly deferred to the district court's finding of fact, holding only that its finding of no bad faith was not "not clearly erroneous." 895 F.3d at 1211. Here, by contrast, holding in favor of the government would require a determination that the district court's finding of bad faith was so baseless as to require reversal in the face of the deference owed to district court factual findings. Further, the evidence here was not spoliated through an "automatic" process as in *Robertson*, *cf. id.* at 1211, and there is no question regarding whether the government knew it wouldn't be preserved. Rather, the government

actively undertook a repair of the vehicle, knowingly destroying its value as evidence. ER-48–60. Additionally, there is no testimony in this case suggesting that any government agent knew the evidence at issue would not be useful. *Cf id.* at 1211–12. On the contrary, the government conceded that the evidence here is potentially exculpatory. ER-198. And the government does not address the district court's factual finding that at least Special Agent Garcia knew the evidence was potentially exculpatory. *See* Op. Br. 24–25.

The standard of review is especially crucial, as the government can only succeed in its appeal if it shows that the district court's finding of bad faith is "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Snyder*, 28 F.4th at 106. Yet the government has not pointed to any cases suggesting that a record like this one is insufficient to support a district court's finding of bad faith. On the contrary, in virtually every decision the government cites, this Court deferred to the district court's factual determination. *Cf. e.g.*, *Heffington*, 952 F.2d at 281 (affirming a finding of no bad faith); *Sivilla*, 714 F.3d at 1171–72 (same); *Dring*, 930 F.2d at 695 (same); *Hernandez*, 109 F.3d at 1455 (same); *Barton*, 995 F.2d at 936 (same);

*Flyer*, 633 F.3d at 916 (same); *Cooper*, 983 F.2d at 931 (affirming a finding of bad faith). And in this case, the district court's findings were supported by extensive evidence showing that the government knew of Mr. Blandon-Saavedra's potential defenses and the significance of Special Agent Tomaselli's vehicle on the same day as the vehicle collision. ER-10–12. Those facts are more than sufficient for this Court to affirm on clear error review the district court's finding of bad faith.

### B. The District Court Applied the Correct Legal Framework

Presumably in hopes of evading the deferential clear error standard, the government insists that the district court committed legal error by misconstruing this Court's definition of "bad faith." Op. Br. 24–25, 28–30. In fact, it is the government that distorts the applicable legal standards.

First, the government argues that the district court improperly conflated negligence and/or recklessness with bad faith. Op. Br. 28–29. But the district court did no such thing. The district court correctly explained, "The presence or absence of bad faith turns on the government's *knowledge* of the apparent exculpatory value of the evidence at the time it was lost or destroyed." ER-10 (quoting *Zaragoza-*

*Moreira*, 780 F.3d at 977) (emphasis added). In other words, the district court accurately stated that knowledge—not mere negligence or recklessness—is required for a showing of bad faith. ER-11; *see also Borden v. United States*, 593 U.S. 420, 427 (2021) (describing "[r]ecklessness and negligence" as "less culpable mental states" than knowledge).[5]

Even though the district court expressly articulated a knowledge standard, the government nevertheless insists that the court in fact applied a negligence standard. Op. Br. 28–29. The government points, Op. Br. 29, to the district court's finding that the government "at best prioritized administrative expedience and the apparent need to avoid an impending funding cutoff over its constitutional duty to preserve

---

[5] Nothing in *Sivilla*, 714 F.3d 1168, supports the government's contention that this Court considers "negligence as a separate factor that shows the government acted in good faith." Op. Br. 28. Indeed, the government neither quotes nor cites any part of the opinion (or any other opinion) in support of this argument. Op. Br. 28.

*Sivilla* provides only a single sentence on the issue: "Thus, while the government was negligent in not preserving evidence, Sivilla is unable to establish that the government's actions rise to the level of bad faith required by *Youngblood*." 714 F.3d at 1172. This passage supports the rule that negligence can be insufficient to show bad faith because negligence does not require knowledge. The opinion in no way suggests that negligence independently demonstrates "good faith." *See id.*; *contra* Op. Br. 28.

exculpatory evidence." ER-12. But the district court also found that, "[a]t worst, the Government intentionally expedited repairs to deny Mr. Blandon-Saavedra his right to inspect and investigate potentially useful evidence." ER-12. And "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Holmes*, 163 F.4th 547, 568 (9th Cir. 2025) (citation modified) (quoting *United States v. Working*, 224 F.3d 1093, 1102 (9th Cir. 2000) (en banc)). The district court therefore did not clearly err in concluding that "HSI's actions in repairing the HSI Vehicle amounted to a 'conscious effort to suppress exculpatory evidence.'" ER-12 (quoting *Zaragoza-Moreira*, 780 F.3d at 980)).

Regardless, the district court's finding that the government "at best prioritized administrative expedience" also supports the conclusion that the government acted with knowledge, not merely with negligence. *Contra* Op. Br. 29. The government's decision to "prioritize[]" its internal agency funding deadline above its discovery obligations is consistent with—and even dependent on—the government's knowledge of those discovery obligations. ER-12. It would make little sense, after all, to say that the government deprioritized an obligation it did not

know it had. And in fact, the district court made clear that the "[g]overnment *was aware* of Mr. Blandon-Saavedra's defense claim *and* the exculpatory value of the HSI Vehicle," but still "prioritized administrative expedience" anyway. ER-12 (emphases added). In other words, the district court expressly found that the government acted with knowledge, not just with negligence. ER-12. And for all the reasons given above, that finding was not clearly erroneous.

The government also suggests that any finding of bad faith was erroneous because it was not trying to gain an unfair advantage at trial when it spoliated the vehicle. Op. Br. 29–30. But bad faith does not require that the government act with that specific purpose. Rather, this Court has repeatedly and clearly held that the "presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Zaragoza-Moreira*, 780 F.3d at 977; *Sivilla*, 714 F.3d at 1172 (same); *Cooper*, 983 F.2d at 931 (same). Malicious subjective intent is not required. *See, e.g.*, *Zaragoza-Moreira*, 780 F.3d at 980 (rejecting identical government argument that it "did not act in bad faith in failing to preserve the evidence because it did not 'purposefully destroy the

evidence to gain an unfair advantage at trial'"). Indeed, this Court has found bad faith when video evidence "had been *automatically* recorded over"—without any government employee's conscious involvement—because the government knew that the evidence was potentially exculpatory but failed to preserve it. *Id.* at 977 (emphasis added).

Finally, the government suggests that it could not have known the HSI vehicle was potentially exculpatory without Mr. Snook's expert opinion. Op. Br. 24–25. But Mr. Snook simply explained why photographs were not a reasonable alternative to the vehicle itself; his opinion was not necessary to explain why the vehicle was potentially exculpatory in the first instance. ER-29–30. That is a distinct element of Mr. Blandon-Saavedra's constitutional claim, which requires "*[f]irst*, that the government acted in bad faith," and "*[s]econd*, that the missing evidence is 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Sivilla*, 714 F.3d at 1172 (quoting *Trombetta*, 467 U.S. at 489) (emphasis added). The district court relied on Mr. Snook's undisputed opinion only to address the second element (which the government does not raise on appeal, *see* Op. Br. 3), not the first element. ER-12–13.

The district court did not, and did not need to, rely on expert testimony to find that the government knew of the vehicle's exculpatory value. ER-11–12. As the district court remarked during the motion hearing, "you don't need to be a lawyer to know the evidentiary value of the actual vehicles in a case where the collision is the subject of the litigation." ER-193. "It's basic." ER-193. The district court therefore found, particularly in light of Special Agent Garcia's "extensive training and experience in criminal investigations," that the government knew the potential exculpatory value of the unrepaired vehicle once Mr. Blandon-Saavedra told Special Agent Garcia that the government vehicles had hit him. ER-11. The government does not address this basis for the district court's finding, and makes no argument that it was clearly erroneous. Op. Br. 24–25. Because the government failed to challenge this finding of fact in its opening brief, that issue has been waived. *See Stennerson*, 150 F.4th at 1281 n.1; *Smith*, 194 F.3d at 1052.

### C. The Government's Purported Compliance with Internal Policy Does Not Compel a Finding of No Bad Faith

The government repeatedly insists that it could not have acted in bad faith because it was following internal policies when it repaired

Special Agent Tomaselli's service vehicle. Op. Br. 2, 12, 16–18, 22–23, 29–30, 33. But this argument is unsupported by the record, and in any event, would not render the district court's finding of bad faith clearly erroneous.

Despite its frequent allusion to internal policy, Op. Br. 5–6, 22–23, 29–30, 33, the government never once identifies a policy requiring it to have repaired Special Agent Tomaselli's vehicle *before* it could be examined by the defense. The only purported policy the government mentions is one requiring an officer to "immediately, among other things, notify his or her supervisor and report the accident or collision to the local Police Department, Sheriff's Department, or Highway Patrol." Op. Br. 5–6; ER-45. HSI will then "generally" obtain a repair estimate, and a Mission Support Specialist "may" then assist in taking the vehicle to a repair shop. ER-45–46. But the government did not violate the due process clause by notifying a supervisor of the collision, obtaining a repair estimate, or relying on a Mission Support Specialist to handle the repair. Rather, the government violated the due process clause when it scheduled the vehicle repair to take place both *before* the defense could examine the vehicle, and *after* it knew of the potentially

exculpatory significance of the vehicle evidence. Yet the government identifies no policy requiring or even suggesting the timing of the repair. In other words, the government does not identify any internal policy covering the acts that actually "disposed of" the evidence at issue: specifically, that the vehicle was repaired after the government knew of the potentially exculpatory significance of the vehicle, and before the defense could examine the vehicle. *Cf. Heffington*, 952 F.2d at 281 (upholding a finding of no bad faith when "the evidence was *disposed of* in compliance with 'departmental procedures.'" (emphasis added)).

Instead, the government acknowledges that the vehicle was quickly repaired to avoid an "impending funding cutoff." Op. Br. 22–23. But that explanation shows that the government repaired the vehicle for reasons other than compliance with departmental policy. This statement therefore supports, rather than undermines, the district court's finding of bad faith. As the district court explained, even though the government "was aware of Mr. Blandon-Saavedra's defense claim and the exculpatory value of the HSI vehicle," it nevertheless "prioritized administrative expedience and the apparent need to avoid

an impending funding cutoff over its constitutional duty to preserve exculpatory evidence." ER-12.

These are not the type of circumstances under which compliance with departmental policy suggests the absence of bad faith. This Court and the Supreme Court have found internal policies relevant when they have actually governed the handling of the evidence, such that the policy itself led to the spoliation. For example, in *Youngblood*, the police criminologist followed "standard departmental procedure" when he tested a sexual assault kit to "determine whether sexual contact had occurred," but did not perform any other tests. 488 U.S. at 53. The fact that the police did not perform additional tests therefore did not suggest bad faith spoliation of evidence. *See id.* at 58. Similarly, in *Barton*, the "district court found that the officer stored . . . marijuana in plastic bags in accordance with an established departmental practice." 995 F.2d at 935. This Court accordingly upheld a finding that the officer did not act in bad faith when storing marijuana in plastic bags, even though the officer accidentally used unventilated plastic bags that destroyed the plants' evidentiary value. *See id.* at 936.

Here, by contrast, the government has not identified any policy that led to its spoliation of evidence, specifically, it having the vehicle repaired before the vehicle could be examined by the defense. No policy required the government to repair the vehicle on any particular timeline. *See* ER-45–46. Rather, the district court found that it was the government's desire to fall within a particular funding deadline—not any departmental procedure—that led the government to repair the vehicle before the defense could examine it. ER-12.

In any event, the cases on which the government relies do not suggest that compliance with internal policy precludes a finding of bad faith. At most, they state that "compliance with departmental procedure should be regarded as an *indication* that the disposal of evidence was not performed in bad faith." *Barton*, 995 F.2d at 935 (internal quotation marks omitted) (emphasis added). An "indication" need not be dispositive. Indeed, as noted above, this Court has held that the record compelled a finding of bad faith even when evidence was destroyed automatically. *Zaragoza-Moreira*, 780 F.3d at 977 (reversing district court finding of no bad faith when video evidence "had been

automatically recorded over within 30 to 45 days of [defendant's] arrest").

The government attempts to distinguish *Zaragoza-Moreira*, Op. Br. 22, pointing to a statement in the opinion that the video was not "destroyed in the normal course of the government's usual procedures." 780 F.3d at 980. But the government's argument mischaracterizes the opinion. The Court in *Zaragoza-Moreira* did not suggest that the government normally preserved old video. On the contrary, it recognized that the destruction of evidence had occurred "automatically." *Id.* at 977. Rather, the Court explained that the government deviated from normal procedures because the agent was aware that she had a general "obligation to collect and preserve both exculpatory and inculpatory evidence," but ignored that obligation in that case. *Id.* at 980. In other words, the deviation from standard procedure was the knowing spoliation of evidence itself. *See id.*

The same reasoning applies here: as the district court found, Special Agent Garcia "surely understood his professional and constitutional duty to preserve potentially exculpatory evidence." ER-11. But the government knowingly failed to abide by that duty in this

case. The district court accordingly did not err in holding that the government's purported compliance with internal policy could not excuse its knowing spoliation of potentially exculpatory evidence. ER-12. This Court should affirm.

## II. Alternatively, the Government's Violation of Rule 16 Supports Dismissal

Federal Rule of Criminal Procedure 16(a)(1)(E) requires that "[u]pon a defendant's request, the government must permit the defendant to inspect . . . tangible objects . . . if the item is within the government's possession, custody, or control and . . . the item is material to preparing the defense." The district court found that the government likely violated Rule 16 by failing to make available for inspection the unrepaired service vehicle, even after the defense's September 8 discovery letter requesting preservation of all "physical evidence." ER-13–14. The government does not dispute the district court's Rule 16 finding on appeal, and has accordingly waived any challenge to it.[6]

---

[6] The government's brief contains a single sentence in its Summary of Argument stating that "the record does not support affirmance based on Federal Rule of Criminal Procedure 16." Op. Br. 13.

(Continued . . .)

The government's violation of Rule 16 is itself sufficient to warrant dismissal of Count 2. Under "Rule 16(d)(2), dismissal of the charges may be an appropriate sanction in situations where the failure to produce is both willful and severely prejudicial." *United States v. Dipp*, 581 F.2d 1323, 1327 (9th Cir. 1978) (citing cases); *see also, e.g.*, *United States v. Hernandez-Meza*, 720 F.3d 760, 769 (9th Cir. 2013) (noting that dismissal with prejudice could be an appropriate remedy for a Rule 16(d)(2) violation if "the government willfully withheld" the evidence). Here, the government willfully spoliated the service vehicle as evidence by intentionally repairing it after receiving a discovery demand, but before the defense had a chance to inspect the vehicle. *See* ER-71, 130, 139–40. And the spoliation was severely prejudicial, because it undisputedly deprived Mr. Blandon-Saavedra of any comparable evidence with which he could support his defenses. ER-12–13. A remedy of dismissal is therefore no "harsher than necessary to accomplish the goals of Rule 16." *United States v. Gee*, 695 F.2d 1165,

---

But the government provides no argument in support of this assertion. When a party "'makes no substantive argument'" in its brief, it "waives th[e] issue on appeal." *Cui v. Garland*, 13 F.4th 991, 999 n.6 (9th Cir. 2021) (quoting *Castro-Perez v. Gonzales*, 409 F.3d 1069, 1072 (9th Cir. 2005)).

1169 (9th Cir. 1985). The Court can affirm the dismissal of Count 2 on this alternative basis, under Rule 16. *E.g.*, *United States v. First*, 731 F.3d 998, 1002 (9th Cir. 2013) (this court "may affirm the district court's dismissal of an indictment on any ground supported by the record even if it differs from the rationale of the district court").

If this Court does not simply affirm, whether on the due process violation or on the alternative ground that there was a now-undisputed Rule 16 violation, this Court could remand so that the district court may in the first instance determine the appropriate remedy for the government's violation of Rule 16. *See Hernandez-Meza*, 720 F.3d at 769 (remanding to the district court to determine whether "dismissal of the indictment with prejudice" was an appropriate remedy for the government's Rule 16 violation).

## CONCLUSION

For the foregoing reasons, Mr. Blandon-Saavedra respectfully requests that the Court affirm the district court's order dismissing Count 2 of the indictment.

Respectfully submitted,

AMY M. KARLIN
Interim Federal Public Defender

Dated: August 26, 2026 By: *_/s/ Aviel Menter_*
Aviel Menter
Deputy Federal Public Defender
Attorneys for Defendant-Appellee

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** No. 25-7261

I am the attorney or self-represented party.

**This brief contains** 10,116 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ______.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s Aviel Menter **Date** August 26, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*